**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John D. ROGERS, Defendant–Appellant.**

No. 95–5351.

United States Court of Appeals,
Sixth Circuit.

Argued March 26, 1996.

Decided July 2, 1997.

Stephen G. Frye (argued), Terry M. Cushing (briefed), Stephen B. Pence, Asst. U.S. Attys., Louisville, KY, Edwin J. Walbourn, III, Office of the U.S. Attorney, Covington, KY, for Plaintiff–Appellee.

John H. Harralson, III (argued), John L. Smith (briefed), Smith & Helman, Louisville, KY, for Defendant–Appellant.

Before: KENNEDY and MOORE, Circuit Judges; WELLS, District Judge.[*]

[*] The Honorable Lesley Brooks Wells, United States District Judge for the Northern District of Ohio, sitting by designation.

## OPINION

MOORE, Circuit Judge.

John Rogers, a former Kentucky State Senator, appeals his convictions for conspiracy to commit extortion and attempted extortion under color of official right in violation of 18 U.S.C. § 1951 (Counts One and Two), mail fraud in violation of 18 U.S.C. §§ 1341 and 1346 (Count Three), and making a materially false statement to a federal agent in violation of 18 U.S.C. § 1001 (Count Four). For the reasons that follow, we affirm Rogers's convictions.

## I. BACKGROUND

In 1983, Rogers, State Senator Frank Miller, and lobbyists Jay Spurrier and William Wester agreed to accept compensation from businessman/banker Wallace Wilkinson in exchange for their efforts to secure the passage of the Multi–Bank Holding Company Bill ("the Banking Bill"). The Banking Bill, which had been defeated by a narrow margin in 1982, would permit Kentucky banks to expand across county lines. The conspirators planned for Wilkinson to purchase a bank in Bowling Green, Kentucky after the Banking Bill passed. After a while, Wilkinson would sell the bank and share half of the profits with Rogers, Miller, Wester, and Spurrier. The Banking Bill passed in April 1984, and Wilkinson purchased a bank in Bowling Green a little over a year later in June 1985. Wilkinson was elected Governor of Kentucky in November, 1987, and while he held that office, the conspirators did not attempt to collect any money from him.

In January of 1992, when Spurrier was arrested for his participation in an unrelated criminal scheme, he told the FBI about the Banking Bill conspiracy. Spurrier agreed to cooperate with the FBI by recording conversations with the other conspirators in which they discussed their deal and their plan for obtaining their share of the bank profits from Wilkinson. During one meeting that Spurrier recorded, Rogers, Miller, Wester, and Spurrier decided to take several photos of

themselves next to a life-sized cardboard photo of Wilkinson. *See* J.A. at 122. Rogers mailed the pictures to Wilkinson with a note to remind him of their deal, stating that the group "had a meeting and it was good [and] this picture just reminded me that we need to have a board of directors meeting some time soon [and that Rogers would] be in touch." J.A. at 130.[1]

Thereafter, Rogers, Miller, Wester, and Spurrier repeatedly attempted to contact Wilkinson. On March 3, 1992, Rogers, Wester, and Spurrier met to discuss their progress in contacting Wilkinson and to estimate the amount they would receive from the sale of the bank. On March 5, Wester, Spurrier, and Miller called Wilkinson to determine whether the photograph Rogers sent to Wilkinson had the desired effect. On March 10, Wester, Spurrier, Miller, and Rogers met again to discuss the passage of the Banking Bill and their anticipated monetary gain. The group attempted to contact Wilkinson in the days that followed.

After several unsuccessful attempts to contact him, Spurrier enlisted the aid of Wallace Wilkinson's nephew and former employee, Bruce Wilkinson. Spurrier recorded three conversations he had with Bruce Wilkinson during which Bruce promised to talk to his uncle about meeting with the conspirators. On March 25, Bruce told Spurrier that his uncle refused to meet with Spurrier and the others. J.A. at 192.

Rogers admitted, on cross examination, that he attempted to arrange a meeting with Wallace Wilkinson to solicit a campaign contribution and to determine whether Wilkinson would follow through on his offer to give Rogers some profits from the bank. J.A. at 344, 348–49. However, Rogers denied that the offer was in any way connected to his support of the Banking Bill. J.A. at 349.

On March 31 and April 1, 1992, two FBI Special Agents interviewed Rogers. During these interviews, Rogers denied his participation in any aspect of the conspiracy or any attempt to extort money from Wilkinson. Rogers denied that Wilkinson owed him anything, that he had any agreement with Wil-

kinson for his support of the Banking Bill, or that he had discussed with others the amount of money owed to him by Wilkinson.

## II. ANALYSIS

### A. *GAUDIN* AND THE MATERIALITY ELEMENT OF 18 U.S.C. § 1001

Rogers was convicted on Count Four for violating 18 U.S.C. § 1001, which provides that "[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations [shall be guilty of an offense against the United States]." To establish a violation of § 1001, the government must prove that: "(1) the defendant made a statement; (2) the statement is false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency." *United States v. Steele*, 933 F.2d 1313, 1318–19 (6th Cir.) (en banc) (citing *United States v. Chandler*, 752 F.2d 1148, 1150 (6th Cir. 1985)), *cert. denied*, 502 U.S. 909, 112 S.Ct. 303, 116 L.Ed.2d 246 (1991). The district court, following existing Sixth Circuit precedent, determined that Rogers's statements to the FBI were material as a matter of law.

In *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), the Supreme Court held that the district court's refusal to allow the jury to pass on the "materiality" of the defendant's false statements under 18 U.S.C. § 1001 infringed on the defendant's constitutional right "to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." *Id.* at 522–23, 115 S.Ct. at 2320. This right is based on the Fifth Amendment guarantee that no one will be deprived of liberty without due process of law and the Sixth Amendment right to a speedy trial by an impartial jury in a criminal case. *Id.* at 508–10, 115 S.Ct. at 2313. *Gaudin* was decided three weeks after Rogers filed his appellate brief. It overruled

---

1. The conspirators referred to themselves as the "board of directors." J.A. at 380.

Sixth Circuit precedent regarding who decides the question of "materiality" in a prosecution under 18 U.S.C. § 1001. *See, e.g., United States v. Abadi,* 706 F.2d 178, 180 (6th Cir.), *cert. denied,* 464 U.S. 821, 104 S.Ct. 86, 78 L.Ed.2d 95 (1983).[2] *Gaudin* applies retroactively in the instant case because "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (addressing the retroactivity of the *Batson* rule). *Accord Johnson v. United States,* —— U.S. ——, ——, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997).

■ The government points out that Rogers failed to request at trial that the jury determine the materiality element under § 1001, and did not raise it in his appellate brief. A defendant's failure to raise an issue in the district court normally constitutes either forfeiture or waiver. "[F]orfeiture is the failure to make the timely assertion of a right, [and] waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) (citations omitted). Of course, Rogers could not have knowingly waived a constitutional right that evolved after he filed his appellate brief because raising the issue would have been futile in light of then-applicable precedent. Several circuit courts have so held in other contexts. *See United States v. Chesney,* 86 F.3d 564, 568 (6th Cir.1996) (holding that defendant did not waive challenge to 18 U.S.C. § 922(g) because the Supreme Court decided *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), after the district court entered judgment); *United States v. Miller,* 406 F.2d 1100, 1105 (4th Cir.1969) (finding that failure to raise issue could not constitute a knowing waiver of constitutional rights where Supreme Court decided a case that affected rights at issue after defendants pleaded guilty); *Lauchli v. United States,* 402 F.2d

455, 456 (8th Cir.1968) (failure to raise issue below does not amount to waiver where subsequent Supreme Court decisions changed the law).

With respect to forfeiture, the Supreme Court recently held that where a defendant failed to object, before *Gaudin,* to the district court's refusal to submit the issue of materiality to the jury under 18 U.S.C. § 1623 (prohibiting perjury before a grand jury), plain error review under Federal Rule of Criminal Procedure 52(b) applies. *Johnson,* at ——, 117 S.Ct. at 1548. *See also United States v. Kramer,* 73 F.3d 1067, 1074 (11th Cir.) (holding that the court was only authorized to undertake plain error review even though the Supreme Court decided *Gaudin* after defendant was convicted), *cert. denied,* —— U.S. ——, 117 S.Ct. 516, 136 L.Ed.2d 405 (1996); *United States v. Ross,* 77 F.3d 1525, 1539 (7th Cir.1996) (applying plain error analysis even though *Gaudin* overturned settled precedent after trial); *United States v. David,* 83 F.3d 638, 645 (4th Cir.1996) (holding, in a case retroactively applying *Gaudin,* that "both the purposes of the contemporaneous objection rule and considerations of sound judicial administration counsel in favor of plain error review where an objection at trial would have been indefensible because of existing law, but a supervening decision prior to appeal reverses that well-settled law, rendering defendant's claim clearly meritorious"); *United States v. Randazzo,* 80 F.3d 623, 631 (1st Cir.1996) (applying a plain error analysis and rejecting the defendant's argument that "it was reasonable not to object since First Circuit precedent was dead against him and *Gaudin* was unexpected").

■ We must apply the plain error doctrine to analyze the failure to submit the question of materiality to the jury. *Johnson,* at ——, 117 S.Ct. at 1548. To review for plain error, first we must determine whether there was error under current law. "If a legal rule was violated during the District Court proceedings, and if the defendant did not waive the rule, then there has been an 'error' within the meaning of Rule 52(b) de-

**2.** *Gaudin* overruled the case law on this issue in every circuit except the Ninth Circuit. *Gaudin,* at 526–27, 115 S.Ct. at 2322 (Rehnquist, C.J., concurring).

spite the absence of a timely objection." *Olano* at 733–34, 113 S.Ct. at 1777 (stating that at a minimum courts of appeals cannot correct an error under the plain error doctrine unless the error is clear under current law).[3] Second, the error must be "plain." *Olano* at 733–34, 113 S.Ct. at 1777. " 'Plain' is synonymous with 'clear' or, equivalently, 'obvious.' " *Id.* In the instant case, there has been "error" that is "plain" under current law because *Gaudin* overruled prior precedent by holding that the jury must decide the element of materiality under § 1001. *See Johnson,* at ——, 117 S.Ct. at 1549 (holding that failure to submit the issue of materiality in a § 1623 prosecution to the jury was "error" under *Gaudin* that was "plain" at the time of appellate consideration).

Third, the defendant must prove that the error "affect[s] substantial rights." Fed.R.Crim.P. 52(b); *Olano* at 732–36, 113 S.Ct. at 1777–78. Generally, this "means that the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." *Id.* at 734, 113 S.Ct. at 1778 (citations omitted). Rogers cannot show prejudice because the evidence establishing the materiality of Rogers's false statements was overwhelming. During two interviews with FBI Agents, Rogers denied any involvement in the criminal acts for which he was convicted. Rogers claims that any false statements he made to the FBI were not material because the FBI already knew the truth based on the recorded conversations acquired through Spurrier.[4] "A statement is material for purposes of section 1001 if it has a 'natural tendency to influence, or be capable of affecting or influencing,' a function entrusted to a governmental agency." *Steele,* 933 F.2d at 1319. The statement need not actually influence the agency, but it must have the capacity to do so. *Id.* In *United States v. LeMaster,* 54 F.3d 1224 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 701, 133 L.Ed.2d 657 (1996), the FBI knew that the defendant had accepted cash from an informant (the same Jay Spurrier involved in the instant case), but this court rejected the argument that the defendant's statement could not have been material because the government already knew the truth: "A false statement can be material even if the agent to whom it is made knows that it is false." *Id.* at 1230–31 (citations omitted). The court reasoned that

> [i]f the investigation had been terminated without interviewing LeMaster, it would have left open the possibility that LeMaster had an innocent explanation for having accepted the money from Spurrier. If such an explanation was offered, the FBI had an obligation to investigate its veracity. Alternatively, the absence of a satisfactory explanation would have tended to corroborate Spurrier's allegations.

*Id.* at 1231 (footnote omitted). In *LeMaster,* we concluded that the defendant's false statements were "not the kind of trivial statements the materiality requirement was meant to exclude." *Id.* Thus, Rogers cannot establish that the error would affect the outcome of his trial on the § 1001 charge.[5]

---

**3.** In *Olano,* the Court explicitly left open "the special case where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified." *Id.* The Court did not contemplate the present situation, where a supervening decision reverses well-settled controlling case law. *Johnson,* however, appears to have filled in the answer. *See United States v. Barone,* 114 F.3d 1284, 1294–95 (1st Cir.1997).

**4.** Rogers contends that he was faced with a "catch 22" situation in that he could either answer truthfully, which would amount to a confession of the crimes charged, or lie, which would result in an additional felony charge for perjury. The Sixth Circuit has explicitly rejected this type of "catch 22" argument. *See Steele,* 933 F.2d at 1320–21 (finding the "Hobson's choice" to admit guilt or be charged with a felony to be "flawed" because "[a]n individual has a constitutional privilege against self-incrimination, but he has no constitutional right to give an untruthful statement.").

**5.** Though we believe that the failure to submit the issue of materiality to a jury could constitute "structural error," *see,* e.g., *Sullivan v. Louisiana,* 508 U.S. 275, 281–82, 113 S.Ct. 2078, 2082–83, 124 L.Ed.2d 182 (1993), and *Arizona v. Fulminante,* 499 U.S. 279, 291, 111 S.Ct. 1246, 1254–55, 113 L.Ed.2d 302 (1991), the Supreme Court indicated in *Johnson* that even if such failure were a structural error, it would not necessarily seriously affect the fairness and integrity of the proceedings. *Johnson* requires more than the existence of a structural defect to meet the *Olano* standard for notice of a plain error.

■ The final step in plain error analysis is to determine whether this case warrants the exercise of our discretion. The Supreme Court has emphasized that "Rule 52(b) is permissive, not mandatory" and that discretion to reverse because of plain error should be exercised only "in those circumstances in which a miscarriage of justice would otherwise result." *Olano* at 735–36, 113 S.Ct. at 1778–79 (citation omitted). The standard guiding our exercise of discretion provides that we "should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 736, 113 S.Ct. at 1779 (citation omitted). As indicated in *Olano,* this standard is not automatically satisfied where a plain error affects substantial rights because "otherwise the discretion afforded by Rule 52(b) would be illusory." *Id.*

On the record before this court, we have no basis to conclude that the fairness and integrity of the proceedings below were seriously affected by the error, or that a "miscarriage of justice" will result. *See Johnson,* at ——, 117 S.Ct. at 1550. Therefore, the error does not meet the *Olano* requirement for review of a plain error under Rule 52(b), and this court affirms Rogers's conviction under § 1001.

### B. STATUTE OF LIMITATIONS

■ Rogers argues that the five year statute of limitations expired before the indictment was returned in this case. *See* 18 U.S.C. § 3282 (providing that the default statute of limitations for non-capital criminal offenses is five years from the date that the offense was committed).[6] Counts One and Two charge Rogers with conspiring and at-

tempting to commit extortion, respectively, in violation of the Hobbs Act, under 18 U.S.C. § 1951.[7] Although Counts Three and Four charge mail fraud and perjury violations, respectively, based on acts occurring after 1992 and therefore clearly within the five year statute of limitations, Rogers contends that the entire indictment should be dismissed as time barred because each count stems from the conspiracy to pass the Banking Bill. Spurrier began cooperating with the government in January 1992. Before that date, the last overt act mentioned in the indictment occurred eight years earlier, in 1984, when the Kentucky General Assembly passed the Banking Bill. Rogers insists that the government "sidestepped" the statute of limitations by creating renewed interest in a long dead and abandoned conspiracy through Spurrier.

We reject Rogers's argument that the government induced the continuation of an otherwise dead conspiracy. In *United States v. Tucker,* 28 F.3d 1420 (6th Cir.1994), *cert. denied,* 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995), we held that "a defendant whose defense sounds in inducement is ... limited to the defense of entrapment...." *Id.* at 1428. Rogers did not present an entrapment defense at trial, and the jury received no instructions on entrapment. Thus, Rogers's inducement theory is without merit.

■ Furthermore, Rogers failed to prove that he withdrew from or abandoned the conspiracy. *See United States v. Hayter Oil Co.,* 51 F.3d 1265, 1270–71 (6th Cir.1995) (holding that withdrawal from a conspiracy constitutes "an affirmative defense which must be proven by the defendant") (citations omitted). "[O]nce a conspiracy has been es-

---

6. Section 3282 states:

 Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

7. Section 1951 provides in pertinent part:

 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires

so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

 (b) As used in this section—

 \* \* \* \* \* \*

 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

tablished, it is presumed to continue until there is an affirmative showing that it has been abandoned." *Id.* "Mere cessation of activity is not sufficient." *United States v. Lash,* 937 F.2d 1077, 1083 (6th Cir.1991) (citing *Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912)), *cert. denied,* 502 U.S. 949, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991), *and cert. denied,* 502 U.S. 1061, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992). Rogers never argued withdrawal or abandonment at trial; therefore he failed to preserve the issue despite having raised it in his pretrial motion to dismiss.

■ Even if Rogers had preserved the issue of withdrawal or abandonment, his claim would fail. The government proved that the conspiracy and Rogers's participation in it, including acts of extortion and mail fraud continued into 1992. Therefore, this case differs substantially from *United States v. Walls,* 577 F.Supp. 772 (N.D.Ga. 1984), which Rogers cites in support of his argument. In *Walls,* the district court granted the defendant's motion for acquittal after he was convicted under 18 U.S.C. § 371, the general conspiracy statute, because the only overt acts the government proved during the limitation period were committed by the informant, acting as a government agent at the time of the overt acts. *Id.* at 773–74. In contrast, in the instant case, the government proved numerous overt acts committed by Rogers in 1992, including several meetings with co-conspirators and the mailing of the picture of the "board of directors" to Wallace Wilkinson.[8] Accordingly, the district court properly denied Rogers's motion to dismiss the indictment on statute of limitations grounds.

## C. PRE–INDICTMENT DELAY

■ Rogers alternatively argues that the district court erred by refusing to dismiss the indictment because the government violated his Fifth Amendment due process rights due to pre-indictment delay. The indictment was not returned until April 1994, two years after the FBI's second interview of Rogers. During this two-year delay, in February 1994, alleged co-conspirator Frank Miller died. Rogers contends that Miller's death caused him actual prejudice and that, since Miller's severe health problems were widely known, the government either knew or should have known that Miller might become unavailable. Furthermore, Rogers argues that the government has offered no explanation for the delay.

Federal Rule of Criminal Procedure 48(b) provides that "[i]f there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, ... the court may dismiss the indictment...." Furthermore, the Supreme Court has stated that "the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that ... pre-indictment delay

---

**8.** Moreover, Rogers conceded that an overt act is not required to establish a conspiracy to violate the Hobbs Act. Appellant's Brief, at 18. At least one case in this circuit has suggested that proof of an overt act is required to establish a violation of 18 U.S.C. § 1951. *United States v. Benton,* 852 F.2d 1456, 1465 (6th Cir.) (stating the elements of a Hobbs Act conspiracy in the context of a double jeopardy claim), *cert. denied,* 488 U.S. 993, 109 S.Ct. 555, 102 L.Ed.2d 582 (1988). However, another Sixth Circuit case has held that although the substantive crime of Hobbs Act extortion required proof that money was extorted, no such proof was required to establish conspiracy under § 1951. *United States v. Shelton,* 573 F.2d 917, 919 (6th Cir.), *cert. denied,* 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978). *See also United States v. DiCarlantonio,* 870 F.2d 1058, 1061 (6th Cir.) ("[a]s with other conspiracies, a conviction of conspiring to obstruct commerce in violation of the Hobbs Act may be

founded upon proof of an agreement to engage in conduct which would violate the statute"), *cert. denied,* 493 U.S. 933, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989), *and cert. denied,* 493 U.S. 933, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989). We recognize that there exists a split among the circuits regarding this issue. Compare *United States v. Stephens,* 964 F.2d 424, 427 (5th Cir. 1992) (holding that an overt act is required) with *United States v. Tormos–Vega,* 959 F.2d 1103, 1115 (1st Cir.) (stating that no overt act is required), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 135 (1992) and *United States v. Maldonado–Rivera,* 922 F.2d 934, 983 (2d Cir. 1990) (same), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991), *and cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858 (1991). Because the government did prove several overt acts in furtherance of the Hobbs Act violations, we need not resolve this issue.

... caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971).

### 1. Substantial Prejudice

■ To prove unconstitutional pre-indictment delay, the defendant must first prove "substantial prejudice to his right to a fair trial." *United States v. Brown*, 959 F.2d 63, 66 (6th Cir.1992). The government argues that Rogers has not demonstrated how Miller's death caused Rogers substantial prejudice since he did not describe what "critical evidence" was lost or how Miller's testimony would have been "exculpatory in nature." Rogers responds that Frank E. Haddad, Jr., Esq., Miller's initial counsel in this matter, and Frank Miller, Jr., the deceased Miller's son, testified that Miller denied any wrongdoing in connection with the Banking Bill and that the whole thing was a joke. J.A. at 213–14, 300–02. But, as the district court noted, Miller had invoked his Fifth Amendment right by refusing to testify before the grand jury and had denied to the FBI that he was ever present during any conversation concerning the alleged conspiracy. J.A. at 95.[9]

■ Several circuits have held that the death of a potentially material witness during an undue pre-indictment delay may prove prejudice, but that it is not alone determinative. E.g., *United States v. Valona*, 834 F.2d 1334, 1338 (7th Cir.1987) (holding that "the death of a witness alone is insufficient to establish actual prejudice") (citing cases); *United States v. Beszborn*, 21 F.3d 62, 66–67 (5th Cir.) (holding that the death of five potentially material witnesses did not prove actual prejudice because the defendant did not show that the testimony of any of the witnesses would have been exculpatory or would have actually aided the defense), *cert. denied*, 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 288 (1994). The death of a potential witness during the pre-indictment period may demonstrate the requisite prejudice if the defendant can demonstrate that exculpatory evidence was lost and could not be obtained through other means. *United States v. Corbin*, 734 F.2d 643, 648 (11th Cir.1984). However, a defendant does not show actual prejudice based on the death of a potential witness if he has not given an indication of what the witness's testimony would have been and whether the substance of the testimony was otherwise available. *Id.*

Even where a defendant specifies what a deceased witness's testimony would have been, actual prejudice is difficult to prove. In *Valona*, the Seventh Circuit found that the death of a potential witness was insufficient to establish actual prejudice even though the defendant had suggested that the deceased could have testified as to the defendant's lawful purpose in transacting business at a particular location on the date in question to controvert the government's evidence that he was engaged in a drug transaction. 834 F.2d at 1338. The court concluded that the deceased's role was "too peripheral to view his absence as substantially prejudicial" because he did not directly participate in the transaction in question. The court noted that it would find prejudice only if it was "convinced that [the witness] would have testified, that his testimony would have withstood cross-examination, and that the jury would have found [him] a credible witness." *Id.* at 1339 (citation omitted). Furthermore, the court stated that it would "evaluate this testimony against the other trial evidence to determine if indeed its introduction would affect the trial outcome." *Id.* See also *United States v. Saunders*, 641 F.2d 659, 665 (9th Cir.1980) (where statement of deceased witness was contradicted by the testimony of two prostitutes, "the prejudicial effect of the deceased witness's missing testimony was indefinite and speculative"), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981).

9. The district court also found that other members of the alleged conspiracy could have testified on Rogers's behalf as to the nature of the alleged co-conspirators' actions. J.A. at 95–96. However, the only other member of the conspiracy whom Rogers realistically could have called in Miller's place was William Wester, because Spurrier testified as a government informant and Wilkinson was not present for the meetings during which the other conspirators discussed how to contact him.

In the instant case, it is not clear that the deceased Miller would have testified, especially because he invoked his Fifth Amendment right in declining to testify before the grand jury. Moreover, if Miller did testify that he was not involved in any wrongdoing relating to the Banking Bill and that the whole thing was a joke, it is unlikely that his testimony would have affected the outcome of the trial. Such testimony would seem virtually implausible in light of Miller's statement to the FBI that he did not participate in any of the conversations recorded, the number of tape recordings in which the conspirators discussed their collection procedures, the specificity of the proof regarding the profit to be made by selling the bank in Bowling Green, and Spurrier's testimony that the conspirators planned to extort money from Wilkinson in exchange for their support on the Banking Bill. Therefore, we agree with the district court's conclusion that Rogers did not show actual substantial prejudice.

### 2. Reason for the Delay

Even if Rogers had established actual substantial prejudice, he failed to satisfy the second part of the test for unconstitutional pre-indictment delay: "that the delay was an intentional device by the government to gain a tactical advantage." *Brown,* 959 F.2d at 66. It is well-established that a delay resulting from investigative efforts "does not deprive [a defendant] of due process, even if his defense may have been somewhat prejudiced by the lapse of time." *United States v. Atisha,* 804 F.2d 920, 928 (6th Cir.1986) (citations omitted), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *see also United States v. Lovasco,* 431 U.S. 783, 796, 97 S.Ct. 2044, 2051–52, 52 L.Ed.2d 752 (1977) (holding that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time").

Rogers argues that the government improperly delayed obtaining an indictment to gain a tactical advantage when it knew or should have known of Miller's serious health problems. Rogers cites the testimony of Miller's son, who stated that there were two newspaper articles about his father's poor health when he withdrew from the race for county judge. J.A. at 297. Furthermore, Haddad testified that everybody knew Miller had health problems. J.A. at 210. Rogers asks this court to find that reckless or negligent disregard of a potentially prejudicial circumstance violates the Fifth Amendment guarantee of due process. *See United States v. Richburg,* 478 F.Supp. 535, 543 (M.D.Tenn. 1979) (stating that the second prong of the *Marion* test may be satisfied where pre-indictment delay was in "reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense"). However, it is firmly established that the defendant must show that "the government purposely delayed in order to gain a tactical advantage over the defendant." *United States v. Lash,* 937 F.2d 1077, 1088 (6th Cir.1991), *cert. denied,* 502 U.S. 949, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991), *and cert. denied,* 502 U.S. 1061, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992); *see also United States v. Duncan,* 763 F.2d 220, 222 (6th Cir.1985); *Brown,* 959 F.2d at 66.

The Assistant United States Attorneys representing the government in this case have flatly denied, under oath, that they knew that Miller was seriously ill. J.A. at 305, 422. Moreover, the government asserts that the development of a thorough and fair investigation and the complexity of the case caused the delay in obtaining the indictment. In support of this argument, the government cites its response to Rogers's motion to dismiss. J.A. at 55. The government does not present sworn testimony on the investigative reasons for the delay, nor does it describe even in a general way what investigation occurred during the two-year period between the last FBI interview of Rogers and the return of the indictment. Nonetheless, the Supreme Court has accepted such representations from counsel in this context. *See Lovasco,* 431 U.S. at 796, 97 S.Ct. at 2051–52 (expressing a willingness to assume that counsel's representations that the delay was caused by the government's efforts to identify additional persons who may have partici-

pated in the offenses were made in good faith). *But see id.* at 799, 97 S.Ct. at 2053 (Stevens, J., dissenting) (criticizing the majority's finding a continuing investigation based on statements counsel made during the appellate process because unsworn statements that were not part of the record could not have been considered by the trial court).

Because Rogers failed to establish each element of the test, we affirm the district court's denial of Rogers's motion to dismiss based on pre-indictment delay.[10]

## D. CO–CONSPIRATOR STATEMENTS

 During Spurrier's testimony, the district court admitted three tape-recorded conversations between Spurrier and Bruce Wilkinson. Rogers argued that the tapes were inadmissible hearsay, but the district court allowed the tapes into evidence under Fed. R.Evid. 801(d)(2)(E), the co-conspirator exception to the hearsay rule. Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Rogers claims that the district court erred in that neither Spurrier nor Bruce Wilkinson were members of the conspiracy at the time the tapes were made. Spurrier had already become an informant, and therefore according to Rogers, his statements could not have been made "during the course and in furtherance of the conspiracy" as required by Rule 801(d)(2)(E). Furthermore, Rogers claims that Bruce Wilkinson was never a member of the conspiracy, and, at most, became an "aider and abettor" by attempting to set up a meeting for the conspirators.

 "In order to admit the statement of a co-conspirator under Fed.R.Evid. 801(d)(2)(E), it must first be determined that the conspiracy existed, that the defendant was a member of the conspiracy, and that the co-conspirator's statements were made 'in furtherance of the conspiracy.'" *United States v. Gessa,* 971 F.2d 1257, 1261 (6th Cir.1992) (en banc) (citations omitted). We review these factual determinations for clear error. *Id.* On the other hand, we review de novo whether the facts warrant the legal conclusion under Rule 801(d)(2)(E) that the statements are admissible even though "otherwise hearsay." *Id.* (citations omitted).

Rogers correctly asserts that Spurrier was no longer a co-conspirator since he was cooperating with the government. *See United States v. Howard,* 770 F.2d 57, 61 & n. 4 (6th Cir.1985) (en banc) (stating that the informant's statements could not be those of a co-conspirator since he had withdrawn from the conspiracy), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986). Nonetheless, assuming Bruce Wilkinson's statements were admissible under Rule 801(d)(2)(E), Spurrier's portion of the conversation may be heard by the jury because it is necessary to put Wilkinson's statements into context. *See id.*[11] Therefore, we must decide whether the district court properly found that Bruce Wilkinson became "part of the conspiracy by agreeing to assist the conspiracy to collect on the arrangement that had previously been in existence" and that although Spurrier "may not have been a co-conspirator [at] that time, he certainly . . . could be construed at least [as an] agent of a co-conspirator because he arranged—used Bruce to arrange the meeting." J.A. at 426.

Rogers argues that the government cannot show that Bruce Wilkinson joined the conspiracy in 1992 because "a conspiracy cannot be proven by an agreement between a defendant and a government agent or informer," *United States v. Barger,* 931 F.2d 359, 369 (6th Cir.1991), and Bruce Wilkinson's only connection with the conspiracy was through Spurrier when he was an informant. Rogers further claims that he was not aware that

---

**10.** The standard for pre-indictment delay is nearly insurmountable, especially because proof of actual prejudice is always speculative. *See United States v. Mays,* 549 F.2d 670, 682 (9th Cir. 1977) (Ely, J., dissenting) ("the burden of summoning affidavits from buried bodies or dimmed minds will be insurmountable").

**11.** To the extent that Rogers is arguing that Spurrier's portion of the conversations should have been excluded, he should have asked for a limiting instruction pursuant to Fed.R.Evid. 105, as in *Howard. See id.*

Bruce Wilkinson was involved in the alleged conspiracy.

 The government need not prove that each conspirator knew every member of the conspiracy, or that each knew the full extent of the conspiracy, because such facts may be inferred from the interdependence of the enterprise. *United States v. Lloyd,* 10 F.3d 1197, 1210 (6th Cir.1993), *cert. denied,* 511 U.S. 1043, 114 S.Ct. 1569, 128 L.Ed.2d 213 (1994), *and cert. denied,* 511 U.S. 1146, 114 S.Ct. 2172, 128 L.Ed.2d 893 (1994), *and cert. denied,* 513 U.S. 883, 115 S.Ct. 219, 130 L.Ed.2d 147 (1994). Furthermore, "[a] defendant can conspire with individuals he has never met, so long as he participates and is aware of their assistance in the criminal venture." *United States v. Medina,* 32 F.3d 40, 44 (2d Cir.1994) (citation omitted). Moreover, "a government agent may serve as a 'link' between 'genuine' conspirators." *United States v. Fincher,* 723 F.2d 862, 863 (11th Cir.1984) (citation omitted) (although appellant dealt directly only with a government agent, it was obvious and known to the appellant that other participants were necessary to the enterprise); *see also Sears v. United States,* 343 F.2d 139, 141–42 (5th Cir.1965) (holding that where tape recording of meeting between defendant and informant showed that defendant knew they were not alone in the criminal enterprise, defendant was properly chargeable as a conspirator with unknown co-conspirators who had dealt directly with only the informant). In the instant case, it is not clear whether Spurrier acted as a "link" between genuine conspirators because Rogers claims he did not know that Spurrier had asked anyone outside the original group of conspirators to assist with the collection of the money from Wallace Wilkinson. When Spurrier testified, he did not name Bruce Wilkinson as among the members of the conspiracy. J.A. at 366. Additionally, in one of the recorded conversations between Spurrier and Bruce Wilkinson, on March 21, 1992, the following exchange took place:

SPURRIER: Well do you remember back when we passed the banking bill?

WILKINSON: Mm Mm.

SPURRIER: We had this little arrangement with him [Wallace Wilkinson] and of course when he was governor we didn't bring it up none.

WILKINSON: Yeah.

J.A. at 182–83. From these statements, it appears that Bruce did not know about the "arrangement" before he was enlisted in 1992 to help contact his uncle; otherwise, there would be no need to inform him about the "arrangement." Later in the transcript, however, the conversation suggests that Bruce may have known about the conspiracy at the time the Banking Bill was passed:

SPURRIER: You were there.

WILKINSON: I was there.

SPURRIER: You saw it, hell we did everything we were supposed to.

WILKINSON: No question.

J.A. at 185. Nonetheless, Bruce Wilkinson's mere knowledge of the existence of the agreement would not be sufficient to prove that he was a member or an agent of the conspiracy. Therefore, the district court probably erred by admitting the recordings of the three conversations between Spurrier and Bruce Wilkinson. However, we need not decide whether the district court erred by admitting the Spurrier/Bruce Wilkinson tapes because any error was harmless.

The erroneous admission of a statement by an unindicted co-conspirator constitutes harmless error when sufficient other evidence demonstrates a defendant's active involvement in the conspiracy. *See United States v. Welch,* 15 F.3d 1202, 1214 (1st Cir. 1993), *cert. denied,* 511 U.S. 1076, 114 S.Ct. 1661, 128 L.Ed.2d 377 (1994), *and cert. denied,* 511 U.S. 1096, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994). Rogers contends that "[a]rguably, the Spurrier/Bruce Wilkinson tapes are the only recordings where some type of a financial deal with Wallace Wilkinson and the passage of Multi–Bank are directly linked." Appellant's brief, at 30. We disagree. The evidence proving the conspiracy was overwhelming. Rogers referred to his reward for assisting in the passage of the Banking Bill as his "grub stake." [12] J.A. at

---

12. "Grubstake" is defined as "[s]upplies or funds advanced to a mining prospector or a person

131. Furthermore, Rogers and his co-conspirators discussed how much money they made on their "investment," and Rogers, who is an attorney, suggested that he could receive his share of the money as a bogus "monthly retainer" from Wallace Wilkinson. J.A. at 136. The conspirators calculated the value of the Bowling Green bank using Rogers's figures, which accurately reflected the book value of stock shares held and loans acquired by Wallace Wilkinson. J.A. at 97–121, 132–34. Rogers also described his understanding of the amount of the profit due to the "board members," as the group referred to themselves: "half is his and half is ours." J.A. at 134. Accordingly, if the district court erroneously admitted Bruce Wilkinson's statements, any error was harmless. *See* Fed.R.Crim.P. 52(a).

### III. CONCLUSION

Thus, we reject each of Rogers's contentions on appeal and **AFFIRM** his convictions in all respects.

starting a business in return for a promised share of the profits." *The American Heritage Dictio-* *nary,* at 579 (2d ed.1982).