NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0185n.06

Nos. 09-1717, 09-1859

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | **Mar 29, 2011** |
| Plaintiff-Appellee, | ) | LEONARD GREEN, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ELENA SZILVAGYI, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Defendant-appellant Elena Szilvagyi appeals the district court's denial of her motion to dismiss the charge of naturalization fraud, in violation of 18 U.S.C. § 1425(a). Szilvagyi was convicted of this charge by a jury and was sentenced to six months' imprisonment. She contends that the district court should have granted her motion to dismiss the naturalization fraud charge on the following bases: (1) a violation of the statute of limitations, (2) improper sealing of the indictment, and (3) a violation of her Fifth Amendment due process rights arising from pre-indictment delay. For the reasons that follow, we affirm.

I.

Szilvagyi, who was born in the Phillippines in 1951, entered the United States in 1969 to attend school and graduated with a nursing degree in 1973. From an unspecified date until 2000, she

was employed by the management company, Su-Pra Enterprises, Inc., in which she became a partner in 1991 and president and stockholder in 1994. From 1989 to 2000, Szilvagyi additionally served as the president of Prime Care Services ("PCS"), a home health care business that was owned and operated by Su-Pra Enterprises, Inc. While serving as the president of PCS, Szilvagyi conspired to commit health care fraud and mail fraud in connection with a home construction project.

## A.

In 1994, Szilvagyi engaged architect and builder, Karl Lundquist, to construct a 12,000 square foot residence for her family. When she and Lundquist met to discuss anticipated costs for the project, she explained that Lundquist would be paid through the PCS payroll, as the Szilvagyis were "so efficient . . . with their Medicare business that they could add other people and it wouldn't even come on a radar screen." After Lundquist accepted this proposal on behalf of himself and his wife, Szilvagyi classified Lundquist as an "administrative network service supervisor" for PCS and subsequently placed additional contractors on the payroll. Meanwhile, she requested that Lundquist not disclose the payroll arrangement to the accountant for PCS. The salaries for the fictitious PCS employees were then passed on to Blue Cross and Blue Shield of Michigan and Medicare for reimbursement. Lundquist eventually withdrew from the construction project in February of 1998, when the home was approximately 99 percent complete.

On February 10, 2004, Szilvagyi pled guilty in the United States District Court for the Western District of Michigan to conspiracy to commit mail fraud and health care fraud. At her guilty plea hearing, she admitted, in pertinent part, that she placed Lundquist and other contractors on the PCS payroll in order "to obtain money to complete the building of [her] home." Szilvagyi later

attempted unsuccessfully to withdraw her guilty plea on the ground that she had lied regarding her guilt and was sentenced pursuant to her plea on June 25, 2004, to 48 months' imprisonment and ordered to pay $865,624 in restitution and a $100,000 fine. In March of 2006, this court vacated Szilvagyi's sentence and remanded the case to the district court for resentencing in light of *United States v. Booker*, 543 U.S. 220 (2005).

On January 31, 2006, a federal grand jury in the Eastern District of Michigan returned a nine-count indictment, which charged Szilvagyi in counts 1 and 8 with conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and conspiracy to commit obstruction of justice and to obstruct a criminal health care fraud investigation in violation of 18 U.S.C. § 371. The indictment alleged that Medicare audits between 1997 and 2000 revealed that PCS and Szilvagyi owed Medicare $7,168,602 for improper billings, including automobile expenses, life insurance, interest expenses, pension expenses, professional fees and home office costs. The indictment stated that Szilvagyi, knowing Medicare would reduce or cease reimbursements to PCS until the debt was paid, had conspired with others "to create two new companies, hide the ownership role of . . . Szilvagyi from Medicare and transfer all of the assets . . . to these two new entities." The indictment further noted that she had offered to pay a witness to lie on her behalf in connection with the federal investigation.

Szilvagyi pled guilty to counts 1 and 8 and was sentenced on July 24, 2007, to 31 months' imprisonment for each count, with the sentences to run concurrent to each other and consecutive to her prior sentence for conspiracy to commit mail and health care fraud. She was also ordered to pay $7,000,000 in restitution and a $100,000 fine.

B.

On September 27, 1996, Szilvagyi applied for naturalization to become a United States citizen by filing an application with the United States Bureau of Citizenship and Immigration Services, previously the Immigration and Naturalization Service ("INS"). On October 23, 1997, district adjudication officer Douglas Pierce interviewed Szilvagyi with regard to her application, at which time he placed her under oath and reviewed the application questions with her. In particular, Pierce asked Szilvagyi in question 15(a) whether she "ha[d] ever knowingly committed a crime for which [she] had not been arrested," to which she responded, "no." Based upon Szilvagyi's responses and test results during the naturalization interview, Pierce approved her application, enabling her to proceed to the final stage of the naturalization process: taking an oath of allegiance before a federal judge.

On November 19, 1997, Szilvagyi took the requisite oath of allegiance to obtain citizenship before a federal judge. At this time, she completed and signed under oath INS Form N-445, which served as an update to her naturalization interview and certified that she remained eligible for naturalization during the time period between October 23 and November 19, 1997. Once again, Szilvagyi responded in the negative when asked, "Have you knowingly committed any crime or offense for which you have not been arrested?" Thereafter, she was sworn in as a United States citizen at the naturalization ceremony.

On October 11, 2007, a federal grand jury returned a one-count indictment charging Szilvagyi with unlawful procurement of naturalization in violation of 18 U.S.C. § 1425(a). The indictment alleged three instances in which Szilvagyi made false statements under oath regarding her naturalization application: (1) On Part 7, question 15(a), of the naturalization application, she denied

having knowingly committed a crime for which she had not been arrested; (2) on Part 7, question 12(g), she "denied ever giving false testimony for the purpose of obtaining any immigration benefit;" and (3) on question 3 of Form N-445, she denied ever knowingly committing any offense for which she had not been arrested. A magistrate judge permitted the government to file the indictment under seal based upon the government's stated fears that Szilvagyi would obstruct justice, but the indictment was unsealed six weeks later on November 27, 2007.

On October 29, 2008, Szilvagyi filed a corrected motion to dismiss the indictment, arguing pretrial delay and a violation of the statute of limitations. The district court orally denied the motion before trial on January 26, 2009. Following a two-day trial, the jury found Szilvagyi guilty of immigration fraud. The district court sentenced her to six months' imprisonment to be served concurrently with her term of imprisonment for convictions in the Eastern District of Michigan for conspiracy to defraud the United States and conspiracy to commit obstruction of justice and to obstruct a criminal health care fraud investigation. The district court also revoked Szilvagyi's United States citizenship. Szilvagyi appeals.

II.

We review a motion to dismiss an indictment on statute of limitations grounds *de novo*. *United States v. Grenier*, 513 F.3d 632, 636 (6th Cir. 2008). Szilvagyi makes two arguments about the limitations period. First, she contends that the statute of limitations began to run on March 10, 1996—the date on which she signed her naturalization application—and expired before the government filed its sealed indictment on October 11, 2007. Second, she contends that, even if the naturalization fraud crime was not complete until November 19, 1997—the date on which she took

the oath of citizenship—the statute of limitations nevertheless expired because the indictment was not unsealed until November 27, 2007, eight days beyond the ten-year statute. In response, the government argues that Szilvagyi was charged with the unlawful procurement of naturalization, and not with *attempting* to procure naturalization by fraud; thus the crime was not complete until she actually obtained citizenship on November 19, 1997. The government also maintains that the date of return of the indictment, not the date of its unsealing, is the relevant date for determining whether the limitations period had run. The parties agree, as do we, that the relevant statute of limitations is ten years. *See* 18 U.S.C. § 3291.

Szilvagyi's indictment for naturalization fraud was premised upon her various misrepresentations under oath with regard to whether she had ever knowingly committed a crime for which she had not been arrested. Specifically, the indictment noted that Szilvagyi signed Form N-445 at the naturalization ceremony on November 19, 1997, in which she "denied ever knowingly committing any crime or offense for which she had not been arrested, when in fact [she] then well knew, she had committed a crime relating to [health care fraud]." Although Szilvagyi contends that the statute of limitations began to run on March 10, 1996, the district court properly rejected this argument on the ground that an applicant for naturalization obtains United States citizenship only after taking an oath of allegiance before a federal judge. *See* 8 U.S.C. § 1448(a) ("A person who has applied for naturalization shall, in order to be and before being admitted to citizenship, take in a public ceremony before the . . . court . . . an oath . . . ."). We have repeatedly recognized that "[t]he statute of limitations begins to run when a crime is complete, that is, when each element of the crime charged has occurred." *Grenier*, 513 F.3d at 636 (citing *United States v. Lutz*, 154 F.3d 581, 586

(6th Cir. 1998)). Consequently, Szilvagyi did not commit naturalization fraud until November 19, 1997, the date on which she took the oath of citizenship, and the statute of limitations began to run on this date.

Although Szilvagyi also argues that "[f]or the purposes of [calculating] the statute of limitations . . . the November 27, 2007 date controlled," this argument is equally without merit. In *United States v. Wright*, 343 F.3d 849, 857 (6th Cir. 2003), we stated that a "timely filed and properly sealed indictment tolls the statute of limitations." *Id.* at 857. In this case, the properly sealed indictment was filed on October 11, 2007, and thus fell within the ten-year statute of limitations, which expired on November 19, 2007. We therefore conclude that Szilvagyi's claims regarding the violation of the statute of limitations are meritless.[1]

III.

Szilvagyi next contends that her indictment was improperly sealed because she "did not need to be arrested, since she had been in custody for years." Although she acknowledges that the government's purpose for sealing the indictment was its concern that she would obstruct justice,

---

[1]Szilvagyi contends in passing that "[i]n the event that the Court determines that the statute of limitations was not violated, [she] was entitled to a jury determination on this issue." Yet, in support of this claim, she cites only *United States v. Fuchs*, 218 F.3d 957, 963 (9th Cir. 2000), an inapt case from the Ninth Circuit, which found plain error in the district court's failure to provide a statute of limitations instruction in a conspiracy case when the overt act that "most strongly support[ed] a finding of conspiracy fell outside the statute of limitations." Because Szilvagyi did not raise the jury instruction claim in the district court, she is entitled, at most, to plain error review in this court. *See United States v. Damra*, 621 F.3d 474, 496 (6th Cir. 2010). Thus, this court "will reverse only if there is (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Baker*, 380 F. App'x 465, 467 (6th Cir. 2010). But Szilvagyi cannot show error, much less plain error, given that her crime was not complete until November 19, 1997, and the sealed indictment was filed on October 11, 2007.

Szilvagyi maintains that "[t]here is nothing to suggest that [she] would have obstructed justice between October and November 2007." The government, however, argues that the magistrate judge properly ordered the sealing of the indictment based upon a legitimate concern that Szilvagyi would attempt to obstruct justice.

"The decision of a magistrate judge to seal an indictment is accorded great deference," and the reviewing court evaluates the district court's determination for an abuse of discretion. *Wright*, 343 F.3d at 856–57 (internal quotations omitted). In determining whether a sealed indictment may be opened after the expiration of the statute of limitations, we consider two factors: "(1) whether the indictment was properly sealed, and (2) whether the defendant has shown actual prejudice from a sealed indictment being opened beyond the statute of limitations." *Id.* at 857. Although the "[g]overnment has the burden of setting forth a justification for sealing the indictment," we evaluate the government's request to seal an indictment "to determine whether any legitimate prosecutorial purpose or public interest supports the sealing of the indictment." *Id.* at 858. In *Wright*, we further stated that "a defendant must show substantial, irreparable, and actual prejudice when a properly sealed indictment is unsealed beyond the statute of limitations" and that "[t]he defendant has the burden of showing that prejudice occurred." *Id.* at 859 (internal quotations omitted); *see also United States v. Burnett*, No. 91-1693, 1992 WL 92669, at *3 (6th Cir. Apr. 24, 1992) (unpublished) (finding no prejudice when defendant was arrested approximately five months after a sealed indictment was handed up).

In this case, the district court determined that the government articulated a legitimate prosecutorial purpose—namely, a concern that Szilvagyi would once again attempt to obstruct

justice—in its request to seal the naturalization fraud indictment. To substantiate its concern, the government explained that Szilvagyi had a history of obstructing justice; indeed, she previously pled guilty to conspiracy to commit obstruction of justice in the federal district court for the Eastern District of Michigan by soliciting a witness to testify falsely on her behalf. Furthermore, she had attempted to hide assets from the probation office during the preparation of her presentence report in connection with her conviction for Medicare fraud in the federal district court for the Western District of Michigan.

The government additionally explained that, when the grand jury returned the indictment in the present naturalization fraud case, Szilvagyi was awaiting re-sentencing for Medicare fraud in the Western District of Michigan. Although Szilvagyi had unsuccessfully attempted to withdraw her guilty plea before sentencing in 2004, she filed a memorandum in 2007 arguing that she was nevertheless entitled to credit for acceptance of responsibility. The government interpreted this behavior as "an additional admission of guilt of the Medicare fraud crime, which [was] at the crux of her current naturalization fraud case," and it voiced concern "that if [Szilvagyi] became aware of the naturalization fraud charge against her she would change her representation to the court regarding her guilt of the Medicare fraud crime *solely* because of the pending charge." However, when the prosecutor became aware that Szilvagyi was no longer asserting that she had accepted responsibility in the health care fraud case, the government moved to unseal the indictment.

In *Wright*, we recognized that "an indictment may be sealed for a multitude of reasons" and that "the need to avoid compromising an ongoing investigation falls within the range of permissible reasons for sealing an indictment." 343 F.3d at 858; *see also United States v. DiSalvo*, 34 F.3d 1204,

1219 (6th Cir. 1994) ("[A]rticulation of a legitimate law enforcement reason is sufficient to allow the sealing of an indictment . . . ."). Here, the government expressed a legitimate concern that Szilvagyi would dispute her guilt in the Medicare fraud case solely to avoid de-naturalization in the pending naturalization fraud case. Although the government may not seal an indictment merely to advance its own prosecution, in this case the government's concern regarding Szilvagyi's potential to obstruct justice was well-founded; indeed, it was buttressed by her expansive history of obstructing justice. Finally, Szilvagyi has not identified any actual prejudice arising from the six-week period that elapsed between the filing and unsealing of the indictment. *See United States v. Srulowitz*, 819 F.2d 37, 40 (2d Cir. 1987) (stating that a defendant must demonstrate "substantial actual prejudice" in order to warrant the dismissal of an indictment that was unsealed beyond the statute of limitations). We therefore conclude that the district court did not abuse its discretion in denying Szilvagyi's motion to dismiss on the basis of an improperly sealed indictment.

IV.

In her final claim, Szilvagyi alleges that she was prejudiced in several ways by preindictment delay in violation of her Fifth Amendment due process rights. In particular, she asserts that various documents were destroyed by the government, that witnesses necessary to her defense—including an attorney who attended her naturalization interview—could not be located, and that she "withdrew an appeal of her motion to withdraw her plea" in the Medicare fraud case that formed the basis of her indictment for naturalization fraud. In response, the government argues that Szilvagyi "cannot prevail because she has not even alleged, let alone proven, that the government intentionally delayed

the indictment to gain a tactical advantage. Nor has [she] shown substantial prejudice to her right a fair trial."

We review "the denial of a motion to dismiss based upon preindictment delay for an abuse of discretion and the related questions of fact for clear error." *United States v. McDougle*, 82 F. App'x 153, 158 (6th Cir. 2003). "In this circuit, dismissal for pre-indictment delay 'is warranted only when the defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage.'" *United States v. Schaffer*, 586 F.3d 414, 424 (6th Cir. 2009) (quoting *United States v. Greene*, 737 F.2d 572, 574 (6th Cir. 1984)). As we have explained, "[t]he standard for pre-indictment delay is nearly insurmountable, especially because proof of actual prejudice is always speculative." *United States v. Rogers*, 118 F.3d 466, 477 n.10 (6th Cir. 1997). Indeed, while acknowledging that the Due Process Clause serves a "limited role" in safeguarding against oppressive delay, the Supreme Court has stated that the statutes of limitations, "which provide predictable, legislatively enacted limits on prosecutorial delay," serve as the primary safeguard against "overly stale criminal charges." *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (internal quotations omitted).

Szilvagyi first contends that she was substantially prejudiced by the destruction of certain exculpatory documents pertinent to the Medicare fraud case, including a memorandum to PCS staff requesting the removal of Lundquist from the payroll. However, the district court determined that Szilvagyi did "not state how she [knew] that this document was destroyed, or if in fact, the document was ever destroyed at all," and additionally observed that "the uncontested record demonstrates that [Szilvagyi] or her counsel had access to the documents as [her] daughter retrieved much of the [PCS]

documentation during the pendency of her conspiracy conviction in the Western District of Michigan." Furthermore, Szilvagyi pled guilty to conspiracy to commit mail and health care fraud, described the offenses in detail at her plea hearing, and abandoned her appeal of the district court's order denying her attempted withdrawal of the guilty plea. In light of her admission of guilt, we find that a memorandum requesting the *removal* of Lundquist from the PCS payroll is not exculpatory, particularly as it demonstrates that Lundquist was unlawfully on the payroll. Thus, Szilvagyi has not satisfied her "heavy burden to prove that pre-indictment delay caused actual prejudice," *Wright*, 343 F.3d at 860, as she has not shown that the allegedly destroyed documents were, in fact, exculpatory. *See Rogers*, 118 F.3d at 475 (rejecting defendant's claim of substantial prejudice to his right to a fair trial arising from the death of witness "since he did not describe what 'critical evidence' was lost or how [the witness's] testimony would have been 'exculpatory in nature.'").

Szilvagyi further contends that she was substantially prejudiced by her inability to locate the attorney who attended her naturalization interview. In response to this claim, the district court remarked that "[t]his allegation is equally without merit, as [she] has failed to indicate how she is prejudiced by the failure to present this witness, and what exculpatory evidence, if any, the attorney would provide." We agree. In *Rogers*, we rejected a defendant's claim that he was substantially prejudiced by the death of a witness because "he ha[d] not given an indication of what the witness's testimony would have been and whether the substance of the testimony was otherwise available." 118 F.3d at 475; *see also United States v. Woods*, No. 98-6452, 2000 WL 353516, at *2 (6th Cir. Mar. 31, 2000) (unpublished) (rejecting defendant's claim of substantial prejudice from a witness's death when the court had "not been told what evidence [that witness] . . . would have been able to

-12-

present . . . or how such evidence would have helped the defense"). Like the defendants in *Rogers* and *Woods*, Szilvagyi baldly asserts that the attorney was "necessary for her defense," yet she has not described the likely substance of this testimony, nor indicated that it would be exculpatory. Thus, she has failed to demonstrate substantial prejudice flowing from the absence of the attorney and other unnamed witnesses.

Szilvagyi also argues that she was substantially prejudiced by her decision not to appeal the district court's order denying her motion to withdraw her guilty plea in the Medicare fraud case. However, she has not offered any evidence suggesting that she would have prevailed on this appeal. Moreover, until October 17, 2007, Szilvagyi was actively pursuing credit for acceptance of responsibility based upon her guilty plea in connection with her re-sentencing in the Medicare fraud case; her claim that she would have pursued an appeal to withdraw her plea is therefore incredible. Thus, Szilvagyi has failed to meet the heavy burden of demonstrating substantial prejudice with respect to her decision not to appeal the withdrawal of her guilty plea in the Medicare fraud case.

Finally, Szilvagyi has not alleged—much less proven—that the "delay was an intentional device by the government to gain a tactical advantage." *Schaffer*, 586 F.3d at 424. We conclude that Szilvagyi's claims asserting unconstitutional pre-indictment delay are without merit; accordingly, the district court did not abuse its discretion in denying her motion to dismiss on this basis.

V.

For the foregoing reasons, we affirm the district court's decision in all respects.