**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0771n.06

No. 09-1557

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
**Dec 16, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| KIRTIS THOMAS, | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | **O P I N I O N** |
| _____ | ) | |

Before: MOORE, SUTTON, and McKEAGUE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Kirtis Thomas was a psychologist who started treating Michel Dumas, a disabled postal worker, in 1989. When Thomas began practicing from his home in 1996 or 1997, his appointments with Dumas ceased, yet Thomas continued until 2006 to bill the Office of Workers' Compensation Programs (OWCP) for sessions with Dumas. After charges were initially brought and dismissed in February 2006, Thomas was indicted on April 5, 2007 for mail fraud, conspiracy to commit mail fraud, and theft of public money. The district court dismissed as time-barred the counts that were premised on acts occurring prior to April 5, 2002. A jury convicted Thomas on all remaining counts.

On appeal, Thomas contends that the government's pre-indictment delay from February 2006 to April 2007 violated his Fifth Amendment due-process rights and that the evidence was insufficient

to support his convictions. We conclude that the delay did not prejudice Thomas and that the evidence was sufficient, and thus we **AFFIRM** Thomas's conviction.

## I. BACKGROUND

### A. Substantive Facts

In 1989, psychologist Kirtis Thomas began counseling Michel Dumas, a United States Postal Service (USPS) employee who had been injured on the job and suffered from "chronic major depression with anxiety and explosive features." R. 51 (10/29/08 Trial Tr., Moore at 76). For some time, their sessions took place at the Ganesh Clinic, which closed in 1996. At that time, Thomas informed OWCP, which he billed for sessions with Dumas, that he was moving his practice to his home address.

Over the next decade, Thomas regularly mailed claim forms and treatment notes to the OWCP. The claim forms contained procedure codes corresponding to forty-five to fifty-minute appointments for psychological treatment. In response, the OWCP sent Thomas a check for $135 per treatment session. Thomas also mailed work-capacity evaluations to the USPS, stating that Dumas's psychological state rendered him unfit to return to work.

Near the end of 1996, however, the reality of Thomas's and Dumas's relationship had diverged from this paper trail. According to Dumas, Thomas called Dumas every few months and the two met in person a few times a year to fabricate patient sign-in sheets and discuss OWCP paperwork—but they never scheduled appointments for counseling and little or no counseling took place. At trial, Thomas admitted that he billed OWCP for forty-five to forty-eight appointments with

Dumas each year, even though he claimed that Dumas showed up only once or twice every two months. A senior claims examiner for the OWCP testified at trial that the OWCP does not reimburse physicians when a patient does not come to a scheduled appointment. Thomas, however, asserted that he believed that his actions were authorized. On July 17, 1990 or 1991, he had "received a call" from a person who identified himself as "the United States Government." R. 54 (10/30/08 Trial Tr., Thomas at 143). Thomas testified that his "jaw dropped" upon receiving the call. *Id.* at 144. The caller left Thomas with the impression that Thomas should "use the kitchen sink as regards to dealing with Mr. Dumas in order to keep him from becoming volatile or becom[ing] explosive, [to] keep him from harming anyone." *Id.* Based on this conversation, Thomas believed that he "could bill whether or not Mr. Dumas missed an appointment, as long as he had [scheduled an appointment for] a specific day and time." *Id.* at 145.

This scheme began to unravel in January 2004. A United States Postal Inspector investigated a report that Dumas, when seeking reimbursement for mileage, had exaggerated the mileage between his home and Thomas's home office. Agents observed Dumas intermittently for nearly two years, including most Thursdays, which were the days of Dumas's appointments. Only on October 6, 2005 did agents see Dumas visit Thomas's home, though Dumas did not enter. A special agent with the Department of Labor Office of Inspector General observed Dumas handing "a package of documents" to Thomas's wife. R. 54 (10/30/08 Trial Tr., Mead at 106, 109–11).

The contents of the envelope were revealed when Thomas was arrested and his home searched on February 8, 2006. The envelope contained a note from Dumas stating the questions

OWCP had asked him about the supposed appointments and making plans for Thomas to "backup [sic] paperwork at least until [Thomas] left Ganesh" and to create "sign[-]in forms to cover back to [19]97." R. 56-3 (Dumas's Notes). Also inside the envelope were sign-in forms with Dumas's signature next to dates from 1997 to 2005, and an undated sign-in sheet. The enclosed record of Dumas's travel had a handwritten note asking Thomas to align the men's records: "Kirtis: Please Add 12/4, 12/11, 12/18 & 1/8." R. 56-7 (Mileage Log). When searching Thomas's home, agents separately recovered Thomas's day planners from 2000 and 2004, which listed Thomas's other patient appointments but never Dumas's name.

## B. Procedural Facts

Though Thomas was initially charged with healthcare fraud in February 2006, the charges were dismissed that same month. On April 5, 2007, a grand jury indicted Thomas for mail fraud in violation of 18 U.S.C. § 1341 and theft of public money in violation of 18 U.S.C. § 641. The government claims that, during the fourteen months that had elapsed since Thomas's arrest, it spoke with Thomas about pretrial diversion, engaged in "voluminous discovery," proposed a pre-indictment plea that Thomas rejected, secured Dumas's cooperation as a witness, and spent three to four months corroborating Dumas's version of events. Appellee Br. at 21–23.

Thomas moved to dismiss the indictment on the basis of the statute of limitations and pre-indictment delay. The district court agreed that counts based on actions prior to April 5, 2002 were time-barred. It denied the motion to dismiss for pre-indictment delay, however, because any evidence that the delay may have rendered unavailable would have been irrelevant and the delay

served legitimate investigatory purposes.  A superseding indictment, issued February 5, 2008, included the original charge of theft of public money and added one count of conspiracy to commit theft of public money and mail fraud in violation of 18 U.S.C. § 371.  It also disentangled the prior singular mail-fraud count, generating a total of twenty-one counts of mail fraud based on acts after April 5, 2002.  A jury convicted Thomas of all twenty-three counts, and the district judge denied Thomas's "motion for judgment in favor of the defendant notwithstanding the verdict or, in the alternative, for a new trial."  R. 47.

At sentencing, the district court departed downward from the sentencing guidelines because Thomas has stage-four sarcoidosis and had been hospitalized repeatedly.  Accordingly, the court sentenced Thomas to one day (time served) in prison and two years of supervised release, along with restitution of $58,175.75 and suspension of Thomas's practice as a social worker.

## II.  ANALYSIS

### A.  Pre-Indictment Delay

We review pre-indictment delay de novo because it involves "a mixed question of law and fact."  *United States v. Brown*, 498 F.3d 523, 527 (6th Cir.), *cert. denied*, 552 U.S. 1050 (2007).  Pre-indictment delay violates the Fifth Amendment's Due Process Clause only if the defendant can show (1) "substantial prejudice to his right to a fair trial" and (2) "that the delay was an intentional device by the government to gain a tactical advantage."  *United States v. Schaffer*, 586 F.3d 414, 424 (6th Cir. 2009) (internal quotation marks omitted), *cert. denied*, 130 S. Ct. 1921 (2010).

### 1. Substantial Prejudice

"The standard for pre-indictment delay is nearly insurmountable, especially because proof of actual prejudice is always speculative." *United States v. Rogers*, 118 F.3d 466, 477 n.10 (6th Cir. 1997). Thomas has not met the high bar for demonstrating substantial prejudice.

Thomas claims that, due to the delay, evidence relating to his provision of treatment at the Ganesh Clinic—treatment records, phone records, and Dr. Ganesh's testimony about Dumas's condition and clinic billing policies—has become unavailable. The absence of this evidence is not prejudicial, however, because the indictment charged Thomas with crimes occurring *after* the Ganesh Clinic closed in 1996, and, further, all of the charges on which Thomas was tried arose after April 5, 2002. Facts relating to treatment at a clinic that closed in 1996 are irrelevant.

The other source of alleged prejudice is Thomas's inability to locate another one of Dumas's treating physicians, Dr. Wayne Dwyer. Thomas had hoped that Dwyer would testify about Dumas's condition and Thomas's billing records. Witness unavailability constitutes prejudice only if the defendant shows that the delay relates to the witness's absence. *See United States v. Wright*, 343 F.3d 849, 860 (6th Cir. 2003), *cert. denied*, 541 U.S. 990 (2004) (holding that the defendant did not suffer prejudice from absent witnesses because he "presented no evidence concerning who these witnesses [were] *or how the delay in the indictment corresponds to their inability to testify*" (emphasis added)). Here, even if Dwyer's testimony could have aided Thomas's case, Thomas has not explained when Dwyer became unavailable or why he was unavailable at the time of trial. As a result, Thomas has not demonstrated prejudice.

### 2. Intentional, Tactical Delay

Nor has Thomas attempted to show that the pre-indictment delay was an intentional, tactical maneuver on the government's part. This court "neither imputes nor presumes an improper purpose," instead requiring the defendant "to demonstrate that the Government had no valid reason for the delay." *Schaffer*, 586 F.3d at 426 (internal quotation marks omitted) (holding that a five-year delay was constitutionally permissible). "[I]nvestigative delay" is a valid reason for delay. *United States v. Lovasco*, 431 U.S. 783, 795 (1977). Even when the government cites its own court filings rather than offering "sworn testimony on the investigative reasons for the delay," we may accept the government's representations about the reason for delay. *Rogers*, 118 F.3d at 476.

Thomas asks us to "infer" intent, noting that, "[a]t minimum, the delay was reckless" because the government had gathered all evidence relevant to the indictment by early 2006. Appellant Br. at 17. The government, however, has proffered valid reasons for delay that relate to the ongoing investigation. For example, at Thomas's instigation, the government explored the possibility of pretrial diversion. Next, it produced evidence in hopes of convincing Thomas to accept a pre-indictment plea agreement. Finally, it secured Dumas's cooperation and spent several months corroborating his story. Thomas has not explained why these reasons are improper.

Because Thomas has shown neither prejudice nor the government's intent tactically to delay, the pre-indictment delay here did not violate the Fifth Amendment.

## B. Sufficiency of the Evidence

We review de novo the denial of a Rule 29 motion for a judgment of acquittal. *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008). In exercising our review, we "examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* "[W]e are bound to make all reasonable inferences and credibility choices in support of the verdict." *Id.* "[C]ircumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Goosby*, 523 F.3d 632, 637 (6th Cir. 2008) (internal quotation marks omitted). In Thomas's case, the evidence supported his convictions for conspiracy to defraud the federal government and all counts of mail fraud.[1]

### 1. Conspiracy to Defraud the United States

The elements of conspiracy to defraud the federal government are "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States." *United States v. White*, 492 F.3d 380, 395 (6th Cir. 2007) (internal quotation marks omitted). Thomas challenges the sufficiency of the evidence for the first requirement—agreement. "The agreement need not be explicit; rather, a tacit or mutual understanding among the parties will

---

[1]Despite claiming to challenge the point in his brief's headings, Thomas has not made a separate argument about the conviction for theft of public money. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Treesh v. Bagley*, 612 F.3d 424, 434 (6th Cir. 2010) (internal quotation marks omitted).

suffice." *Id.* (internal quotation marks omitted). Likewise, the evidence need not prove the tacit

agreement explicitly: "[t]he existence of a conspiracy may be inferred from circumstantial evidence

that can reasonably be interpreted as participation in the common plan." *United States v.*

*Faulkenberry*, 614 F.3d 573, 584 (6th Cir. 2010) (internal quotation marks omitted).

Dumas testified that he "assumed" that Thomas was billing OWCP for missed appointments.

R. 54 (10/30/08 Trial Tr., Dumas at 33). Thomas contends that Dumas's *assumption* reveals a lack

of *knowledge*, which in turn belies Dumas's supposed agreement with Thomas to defraud the

government. But as *White* makes clear, a tacit, mutual understanding satisfies the agreement

requirement. Moreover, Dumas clarified that he conversed with Thomas about which dates to list

as appointment dates in submissions to the OWCP. A reasonable jury could have inferred the

existence of an agreement from Dumas's testimony alone.

The package of falsified documents and notes that Dumas gave to Thomas's wife also

supported the existence of a conspiracy. Thomas protests that the documents "represent Dumas'[s]

frantic attempt to cover up *his own* wrongdoing." Appellant Br. at 20. Similarly, Thomas believes

that he disclaimed involvement in any joint operation by replying "that's on you" when Dumas asked

questions about how to falsify his records of mileage to his supposed appointments. *See* R. 54

(10/30/08 Trial Tr., Dumas at 32). The evidence might not foreclose Thomas's theory, but a rational

trier of fact could have inferred an agreement. Dumas's wrongfully billed mileage and Thomas's

wrongfully billed appointments are inextricably linked by the men's mutual arrangement to forego

psychotherapy sessions. Taking the evidence in the light most favorable to the government, a reasonable jury could have found that Thomas and Dumas conspired to defraud the government.

### 2. Mail Fraud

Mail fraud requires "1) a scheme to defraud 2) which involves a use of the mails 3) for the purpose of executing the scheme." *United States v. Henson*, 848 F.2d 1374, 1378 (6th Cir. 1988) (internal quotation marks omitted), *cert. denied*, 488 U.S. 1005 (1989). Even "innocuous," truthful mailings satisfy the third element "if they are an expectable part of a larger scheme." *Id.* at 1378–79 (internal quotation marks omitted). Thomas challenges the sufficiency of the evidence to prove the first element and, as to the forms confirming Dumas's work restriction, the third element.

Thomas insists that he did not have a scheme to defraud the government. In his view, a phone call from the U.S. government authorized him to bill the government even when Dumas did not show up at his supposedly scheduled appointments. In response, the government speculates that the jury, like the district court judge, did not believe Thomas's incredible story. *See* R. 47 (Rule 29 Mot. Tr. at 22–23) (stating that, in the view of the district judge, the claim that the government authorized billing for missed appointments "was clearly . . . a deliberate falsehood by Mr. Thomas"). More broadly, the day planners and surveillance reasonably could have undercut any possible belief that the appointments had even been scheduled. Even under the purported billing rule that Thomas extracted from the phone call, billing for *un*scheduled appointments would be a scheme to defraud. Viewed in the light most favorable to the government, the evidence permitted a reasonable jury to discern a scheme to defraud.

The third element is also satisfied, even as to the work-restriction forms, because Thomas mailed the forms with the purpose to defraud. The forms may have been truthful because other doctors have confirmed Dumas's disability at various times. Nevertheless, the forms were part of the overarching scheme to defraud. Forms "indicat[ing] that the worker is still totally disabled," R. 51 (Trial Tr., Moore at 80–81), purport to confirm that Thomas's evaluation and treatment of Dumas was ongoing. In fact, the reality of Dumas's illness only makes Thomas's failure to provide treatment more egregious.

The evidence, viewed in the light most favorable to the prosecution, supports the jury's finding that Thomas conspired to commit and committed mail fraud.

## III. CONCLUSION

For the reasons explained above, we **AFFIRM** Thomas's conviction.